UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
MATTHEW JENKINS,

                        Plaintiff,         15 CV 5889 (RJD) (RER)

       -against-

CITY OF NEW YORK,
ORLAN ZAMBRANO, and         **FIRST AMENDED COMPLAINT**
JOHN DOES 1-3,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

       Plaintiff Matthew Jenkins, by his attorneys, the Lumer Law Group and Zaltzberg & Hutchinson, LLC, as and for his First Amended Complaint, hereby alleges as follows, upon information and belief:

### PARTIES, VENUE and JURISDICTION

       1.     At all times hereinafter mentioned, plaintiff Matthew Jenkins was an adult male resident of Kings County, within the State of New York.

       2.     At all relevant times hereinafter mentioned, defendant City of New York ("New York City") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York and acts by and through its agencies, employees and agents, including, but not limited to, the New York City Police Department ("NYPD"), and their employees.

       3.     At all relevant times hereinafter mentioned, defendant Orlan Zambrano, also known as Orlen Zambrano, Tax Number 937779, was employed by the City

of New York as a member of the NYPD. Zambrano is sued herein in his individual capacity.

4.  At all relevant times hereinafter mentioned, defendants John and Jane Does 1-3 were individuals employed by the City of New York as members of the NYPD whose actual and complete identities are not known to plaintiff at this time. The Doe defendants are sued herein in their individual capacity.

5.  This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. § 1983.

6.  Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

**RELEVANT FACTS**

<u>The First Arrest</u>

7.  On October 13, 2012, at or about 7:55 P.M., plaintiff was arrested by members of the NYPD's Narcotics Division at or near the intersection of Bergen Street and Nostrand Avenue in Brooklyn, New York, for participating in a hand-to-hand sale of crack cocaine with another apprehended defendant and an undercover police officer (the "First Arrest").

8.  Police Officer Walter Marin was the arresting officer and a supervisor, Sergeant Michael Weber is believed to have also been present. It is believed that one or more

of the Doe defendants were also present at or participated in the plaintiff's First Arrest.

9. One or more officers claimed that, during the course of his arrest for participating in the narcotics sale, plaintiff deliberately swallowed crack cocaine.

10. Immediately following the First Arrest, plaintiff was brought by the arresting officers, or by other officers acting at their behest or further to their request, to Woodhull Medical Center ("Woodhull").

11. Plaintiff was not injured during the First Arrest and did not require nor request any medical treatment for any injuries or medical condition.

### Events at Woodhull

12. Plaintiff arrived with members of the NYPD at Woodhull's Emergency Department at or about 8:40 P.M.

13. The plaintiff was in NYPD custody when he arrived at Woodhull, and remained in NYPD custody for the entire time that he was at Woodhull in October 2012.

14. One or more police officers remained present with plaintiff at all times during his stay at Woodhull in October 2012, during which plaintiff was almost always handcuffed or shackled.

15. The sole reason defendants brought plaintiff to Woodhull was because one or more of the arresting officers stated that plaintiff ingested crack cocaine at the scene of the arrest.

16. Plaintiff was not injured and was not in any distress when he arrived at Woodhull, nor was there any evidence that he had swallowed narcotics earlier in the evening

or required treatment or care for ingesting narcotics or for any sort of intoxication.

17. At or shortly after midnight, in the very early hours of October 14, 2012, plaintiff was brought to Woodhull's Radiology Department for an abdominal scan.

18. Zambrano, and upon information and belief, at least one Doe defendant, accompanied plaintiff to Radiology.

19. The abdominal scan was performed at or about 12:30 A.M. on October 14, and did not reveal any evidence of any foreign bodies or that plaintiff had ingested narcotics.

20. Zambrano, or one of the Doe defendants, returned to the Emergency Department to obtain an authorization for a second set of x-rays, stating that plaintiff had removed narcotics from his anus and then swallowed them.

21. This claim was false. Plaintiff did not, at any time in Woodhull, attempt to remove drugs from his anus, or actually remove drugs from his anus, or engage in any conduct that could reasonably be viewed as an attempt to remove drugs from his anus.

22. Plaintiff did not, at any time in Woodhull, attempt to swallow drugs or actually swallowed drugs, or engage in any conduct that could reasonably be viewed as an attempt to swallow drugs.

23. Sometime after 1:00 A.M., new scans of plaintiff's chest and abdomen were performed. These scans, which were taken less than an hour after the alleged re-ingestion of narcotics, also did not reveal any evidence of any foreign bodies or that plaintiff had ingested narcotics.

24. While plaintiff was still at the Radiology Department, some time prior to 2:00 A.M., Zambrano violently assaulted plaintiff, striking him in the head and face with great force or otherwise causing plaintiff to suffer traumatic injuries to his head and face.

25. To the extent that any of the Doe defendants did not participate personally in the assault on plaintiff, each such defendant was aware of the assault by Zambrano, and failed to intervene or otherwise protect plaintiff in order to prevent or limit his injuries.

26. Plaintiff was then returned at about 2:00 A.M. to the Emergency Department, where medical personnel observed that the left side of his face was "grossly" and "profoundly" swollen, with blood in his mouth, and injuries over his right eye.

27. A CT scan of plaintiff's head and face was then conducted, which established that plaintiff had suffered additional injuries, including a subdural hematoma.

28. The entirety of plaintiff's injuries, including the intracranial wound, were caused by Zambrano's use of force against plaintiff in those early morning hours of October 14, 2012.

29. Plaintiff was subsequently admitted to Woodhull at or about 4:30 A.M. on October 14, 2012.

30. Plaintiff was admitted for treatment and care related to the traumatic head and facial injuries in general, and his traumatic brain injury in particular.

31. Plaintiff was not admitted for any narcotics-related purpose nor for any evaluation or treatment related in any way to the allegation that he had ingested narcotics on

either October 13 or October 14, 2012.

32. Plaintiff was discharged from Woodhull on or about October 17, 2012, to the custody of the NYPD.

33. The traumatic brain injury inflicted by Zambrano caused plaintiff to suffer serious and permanent physical injuries, including the onset of seizure disorder. Moreover, plaintiff has suffered seizures, and will continue to suffer from and be at risk for such seizures for the remainder of his life. Plaintiff's seizure disorder further requires him to take medication that have caused and will continue to cause plaintiff to suffer from a variety of serious and potentially dangerous side effects.

<u>The Second Arrest</u>

34. On October 14, 2012, sometime following his use of force against plaintiff in Woodhull, Zambrano told his fellow officers that, while in Radiology, he observed plaintiff remove narcotics from his anus and swallow them. Zambrano further alleged that he attempted to stop plaintiff from doing so and that plaintiff resisted arrest at that time.

35. Police Officer Walter Marin, who was the arresting officer for the First Arrest, created arrest paperwork concerning Zambrano's allegations about the events that occurred in the Radiology Department, and a second arrest number was generated for these events at Woodhull. In other words, the events at Woodhull's Radiology Department, formed the basis for a new arrest of plaintiff, notwithstanding the fact that he was already in custody for the First Arrest (the "Second Arrest").

36. Marin drafted paperwork restating Zambrano's allegations about seeing plaintiff swallow narcotics and resist arrest.

37. These claims were false, as plaintiff had not at any time on October 14, 2012, removed drugs from his anus or placed drugs in his mouth, or otherwise engaged in conduct that could reasonably be seen as an attempt to remove anything from his anus or swallow narcotics.

38. The claims were also false in that plaintiff did not resist arrest in any fashion. Plaintiff was compliant with all lawful orders given to him by the defendants while he was at Woodhull, and at no point did he engage in any unlawful activity or any behavior that could reasonably be viewed as unlawful.

39. On or about October 14, 2012, Marin forwarded the arrest paperwork from the First and Second Arrests to the Kings County District Attorney's office ("KCDA") in order to justify the arrest and use of force against plaintiff, and to persuade the KCDA to initiate the plaintiff's criminal prosecution with respect to both arrests.

40. On or about October 14, 2012, the KCDA interviewed Marin with respect to the First Arrest.

41. On or about October 14, 2012, the KCDA interviewed Zambrano with respect to the Second Arrest.

42. During this interview, Zambrano repeated his false allegation to the KCDA that while in the Radiology Department, plaintiff withdrew a plastic bag from his anus and swallowed it, and resisted Zambrano's efforts to restrain and handcuff him.

43. Zambrano further told the KCDA that plaintiff had tested "positive for a massive dose of cocaine." This statement was false, as was the implication that any positive test for cocaine was evidence that he had swallowed narcotics incident to either the First or Second Arrest.

44. Zambrano did not tell the KCDA that the chest and abdominal screens did not reveal any evidence that plaintiff had swallowed narcotics.

## General Allegations

45. The Second Arrest was made without probable cause or a reasonable basis to believe probable cause existed, and was objectively unreasonable.

46. At no time on October 14, 2012, did plaintiff engage in any criminal conduct, much less the conduct attributed to him by Zambrano.

47. Zambrano's statements to his fellow officers and the KCDA about the facts and circumstances surrounding the Second Arrest was deliberately false and made to cover up and justify Zambrano's unlawful and excessive use of force against plaintiff.

48. At no time on October 14, 2012, did there exist any basis to utilize any level of force against the plaintiff, much less the force actually employed, nor could any of the defendants have reasonably believed that such force was necessary. At no time did any of the defendants take any steps to intervene in, prevent, or otherwise limit the above mentioned misconduct.

49. That at all times relevant herein, the defendants were on duty and acting within the scope of their employment, and their acts were done in furtherance of the

City of New York's interests and without legal justification or excuse.

# FIRST CAUSE OF ACTION

## (§1983 Claims Against the Individual Defendants)

50.     Plaintiff repeats the preceding allegations as though stated fully herein.

51.     The individual defendants willfully and intentionally subjected plaintiff to physical force in excess of what was reasonable under the circumstances causing plaintiff to suffer physical injuries, by using force against him and causing him to suffer serious head and facial trauma, and did so without a reasonable basis to believe that such conduct was appropriate, reasonable, lawful, or necessary.

52.     The individual defendants deliberately forwarded fabricated evidence to justify and cover up the absence of probable cause for the Second Arrest and the use of excessive force against plaintiff, and forwarded said fabrications to the KCDA, and thus contributed to the initiation and continuation of plaintiff's criminal prosecution and the deprivation of plaintiff's liberty.

53.     To the extent that any one of the individual defendants did not personally engage in the aforementioned conduct, he or she witnessed this conduct as it occurred, was aware that it was occurring or would occur, had ample opportunity to intervene to prevent it from occurring or continuing to occur, and failed to do so.

54.     By so doing, the individual defendants subjected the plaintiff to (i) excessive force, and (ii) the deprivation of his right to a fair trial through the use of fabricated

9

evidence, and thereby violated and aided and abetted in the violation of plaintiff's rights under the Fourth, Sixth and Fourteenth Amendments of the United States Constitution.

55. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## SECOND CAUSE OF ACTION

**(Monell Claim Against the Municipal Defendant)**

56. Plaintiff repeats the preceding allegations as though stated fully herein, including the allegations set forth in the First Cause of Action.

57. Not only has the municipal defendant effectively ratified such misconduct by NYPD members generally, the foregoing violations of plaintiff's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable to the defendant City of New York, amounting to deliberate indifference to the constitutional rights of persons, including plaintiff, who are subjected to excessive force and other misconduct by officers the NYPD know have a demonstrated history of such misconduct.

58. The municipal defendant was on notice prior to October 14, 2012, that defendant Zambrano had a history of engaging in misconduct, including, but not limited to, unlawful and otherwise unjustified acts of violence, based on events that occurred after Zambrano had been hired by the NYPD. Notwithstanding such notice, the NYPD failed to

take any meaningful supervisory action or otherwise reasonably respond to Zambrano's conduct, covered up his further misconduct, and left Zambrano in place to continue his pattern and practice of unconstitutional behavior.

59. According to the Eastern District of New York's dockets, defendant Zambrano has been named in nine (9) other civil rights lawsuits in this district alleging a variety of constitutional violations, ranging from excessive force to false arrest and post-arraignment deprivation of liberty claims. These cases include *Torres v. City of New York*, 09 CV 3686 (CBA) (RML); *Smith v. City of New York*, 11 CV 2340 (NGG) (LB); *Myers v. City of New York*, 11 CV 2344 (NGG) (SMG); *Jewell v. City of New York*, 12 CV 2352 (KAM) (JMA); *Buie v. City of New York*, 12 CV 4390 (RJD) (CLP); *Holiday v. City of New York*, 13 CV 735 (SJ) (SMG); *McAllister v. City of New York*, 13 CV 1476 (RJD) (JMA); *Wade v. Zambrano*, 15 CV 542 (BMC); *Williams v. State of New York*, 16 CV 1677 (PKC) (LB).

60. All of these lawsuits have since been resolved, although *Williams* is still listed as open on the docket. Nearly every lawsuit resulted in a settlement.

61. [REDACTED]

62. [REDACTED]

63. [REDACTED]

64. [REDACTED]

65. [REDACTED]

66. Notwithstanding the above litany of complaints concerning Zambrano's propensity for violence, the City of New York not only continued to employ

11

Zambrano, but in fact promoted him to Detective prior to October 2012.

67.     Moreover, there were, on information and belief, no meaningful investigations into these complaints, and certainly no attempt whatsoever by the NYPD or the City of New York to examine Zambrano's conduct holistically. Put differently, the City was aware of this pattern of excessive force by Zambrano against people incident to arrest and, much like what happened here, while they were in his custody. Yet, upon information and belief, there was no effort to modify, increase, supplement, or otherwise intensify Zambrano's supervision, or otherwise ensure that he had not and would not engage in such blatant misconduct.

68.     The City of New York's refusal to impose any discipline, to conduct any meaningful investigation, or to otherwise express even the slightest scintilla of concern that Zambrano was prone to unnecessary and unjustifiable violence was a clear and unequivocal endorsement of Zambrano's misconduct that could only be understood as a ratification of his past misconduct, and an encouragement that he continue to use force in this fashion.

69.     In fact, the NYPD's response to the assault on plaintiff in this case is itself compelling evidence of the City's deliberate, ongoing, and systemic efforts to cover up this sort of misconduct.  More precisely, the NYPD affirmatively sought to cover up both Zambrano's initial misconduct by simply exonerating him within days of receiving a report of plaintiff's injuries.

70.     In this case, [REDACTED]

71. [REDACTED]

72. [REDACTED]

73. Such actions by the City of New York are a reflection of the municipal defendant's repeated and untenable abdication of its responsibility to supervise and discipline its employees, and to otherwise protect the public from officers the NYPD knows are a threat to the public's safety and well being, and evince a complete disregard and deliberate indifference to the rights and welfare of those with whom these officers, and Zambrano in particular, interact.

74. These actions further reflect a policy, custom, and practice, or a ratification thereof through a demonstrated failure to act to curtail such behavior, and thus the aforesaid policies, procedures, regulations, practices and/or customs of the municipal defendant were, collectively and individually, a substantial factor in bringing about the aforesaid constitutional violations by the individual defendants generally, and Zambrano in particular.

75. The City's abdication of its duty to supervise its police officers, and its tacit, if not overt, endorsement of excessive force and similar misconduct, reflects the City's deliberate indifference to the established risks that such conduct poses to the public at large.

76. The City's failure to act in the face of overwhelming evidence that Zambrano was prone to excessive and unnecessary violence against civilians is evidence of its deliberate indifference to Zambrano's demonstrated pattern of behavior, and the very real risk that he would continue to engage in constitutional violations, such as the assault that he

eventually committed against plaintiff.

       77.     By reason thereof, the municipal defendant has violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## DEMAND FOR A JURY TRIAL

      Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against defendants jointly and severally as follows:

    i.    actual and punitive damages against the individual defendants in an amount to be determined at trial;

    ii.    actual damages in an amount to be determined at trial against the City of New York;

    iii.    statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and New York common law, disbursements, and costs of the action; and

    iv.    such other relief as the Court deems just and proper.

Dated:  New York, New York
         June 20, 2017

LUMER LAW GROUP
Attorneys for Plaintiff

By: *[signature]*

Michael Lumer, Esq.
225 Broadway, Suite 2700
New York, New York 10007
(212) 566-5060


ZALTZBERG & HUTCHINSON, LLC
Attorneys for Plaintiff

By: /s/

Raoul Zaltberg, Esq.
305 Broadway, Suite 900
New York, New York 10007
(212) 323-7418