UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
MATTHEW JENKINS,

               Plaintiff

       - against -                            **MEMORANDUM OF DECISION**

CITY OF NEW YORK, and
ORLEN ZAMBRANO                         15 CV 5889 (RJD)

               Defendants.
-------------------------------------------------------- x

DEARIE, District Judge

     On October 13, 2012, Plaintiff Matthew Jenkins ("Jenkins") was arrested by members of

the New York City Police Department ("NYPD") for selling crack-cocaine to an undercover

officer. Def. Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF No. 67 ("Def.

56.1"), ¶ 4. During the arrest, one of the officers believed Jenkins was experiencing a drug

overdose, and had Jenkins transported by ambulance to Woodhull Medical Center ("Woodhull").

Id. at ¶¶ 5-6. In the early hours of October 14, 2012, NYPD Detective Orlen Zambrano

("Zambrano") escorted Jenkins in handcuffs to Woodhull's Radiology unit for abdominal scans.

Id. at ¶ 7. While there, Jenkins was injured during a physical altercation with Zambrano. Id. at ¶

8. According to Jenkins, Zambrano repeatedly struck him in the head and face with great force

and without justification. Amended Compl., ECF. No. 44, ¶ 24. According to Zambrano, while

Jenkins was lying on a table awaiting his scan, Jenkins tried to remove hidden drugs from his

"rear end" and Zambrano attempted to stop him by throwing him to the ground, causing a

contusion to Jenkins's face. Pl. Statement of Undisputed Facts Pursuant to Local Rule 56.1, ECF

No. 72 ("Pl. 56.1") ¶ 209; Alexander Noble Decl., ECF No. 83 ("Noble Decl."), Ex. C at 99,

102. Zambrano claims that he witnessed Jenkins swallow drugs he removed from his rear,

though a subsequent abdominal scan did not reveal any obstruction or foreign body. Noble Decl., Ex. C at 102; Michael Lumer Declaration, ECF No. 70 ("Lumer Decl."), Ex. 1 (Paynter Expert Report) at 1. Additionally, there is no evidence in Jenkins's medical records that he had ingested cocaine either before arrival, or while in the hospital. Lumer Decl., Ex 1. at 2. Medical personnel observed swelling to the left side of Jenkins's face and a bump over his right eyebrow. Jenkins was taken for a CT scan of his head and face. Id.

Shortly after the incident, Zambrano notified his supervisor, Sergeant Michael Weber ("Weber"), about what happened, including the fact that Jenkins was injured. Pl. 56.1 ¶ 207. Weber relayed the information to the NYPD Internal Affairs Bureau ("IAB"). Id. at ¶ 205. IAB created an intake report based on Weber's telephone call and waited for additional information about Jenkins's diagnosis. Id. at ¶ 208. About half an hour later, Weber once again called IAB and relayed that Jenkins had been diagnosed with a contusion to his face, requiring no stitches and with no broken bones, and had been released to NYPD custody. Id. at ¶ 211.

In reality, Jenkins had not been released because his CT exam revealed he had suffered a subdural hematoma with soft tissue swelling and, following the CT scan, he was admitted to the hospital. Lumer Decl., Ex. 1 at 1. A subsequent CAT scan revealed he was neurologically intact and he was transferred to the critical care area for monitoring and given anti-seizure medication. Id.

IAB referred the investigation to the Chief of Department and Investigative Review Section, and to the Organized Crime Control Bureau ("OCCB"), of which Zambrano was a member. Lumer Decl., Ex. 4 (Deposition of IAB Deputy Inspector Jose Frias) ("Frias Dep.") at 69-74. IAB Deputy Inspector Jose Frias ("Frias") testified that IAB did not review Jenkins's medical records or discuss his condition with medical personnel at Woodhull to independently

confirm the accuracy of Weber's report of Jenkins's diagnosis because Weber was "a sergeant in the NYPD and [he] expect[ed] him to be truthful and honest." Id. at 86-89, 91. Surprisingly, no one at IAB interviewed Zambrano or Jenkins about the incident. Pl. 56.1 ¶¶ 210-212; Frias Dep at 97-98. However, Frias testified that he would have taken a different course of action if he had been informed that Jenkins had suffered a subdural hematoma. Frias Dep at 89-90.

The OCCB "exonerated" Zambrano, though there is no evidence on the record about how or why they reached that conclusion. See Lumer Decl., Ex. 5 (BCATS Form). Jenkins was indicted for the sale of drugs and pled guilty on August 8, 2013. Def. 12/1/17 Letter, ECF No. 52, at 2.

On October 13, 2015, Jenkins filed a Complaint, which he amended on June 20, 2017, alleging excessive force against Zambrano, and asserting a claim of municipal liability against the City of New York ("the City"), pursuant to Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978). Jenkins argues that, in light of numerous prior allegations against Zambrano for excessive use of force and other misconduct, the NYPD was deliberately indifferent to the risk that Zambrano would use excessive force against Jenkins and other civilians. The City now moves for summary judgment with respect to Jenkins's Monell claim. Def. Mem. in Supp. of Mot. for Partial Summ. J., ECF No. 68 ("Def. Mem.").[1] For the reasons stated below, the City's motion is denied.

BACKGROUND

Jenkins's allegations are not the first time Zambrano has faced serious abuse complaints. Far from it. 30 separate complaints were filed against Zambrano prior to the incident with

---

[1] Jenkins's excessive force claim against Officer Zambrano is ready for trial.

Jenkins on October 14, 2012. Half of these involved allegations of excessive force, including instances when the injured complainant, like Jenkins, was securely in police custody. The ensuing investigations ranged between modest and perfunctory and were for the most part concluded as "unsubstantiated" or otherwise unresolved. In only one instance was Zambrano found to be at fault for failing to make an entry in his memo book following another violent confrontation with a complainant.[2] Despite these largely undisputed facts, the City argues that no reasonable fact finder could conclude that a de facto policy of tolerance for police misconduct exists.

*Zambrano's Prior IAB and CCRB History[3]*

Zambrano started working with the NYPD in 2005 and retired in 2015. Pl. 56.1 ¶ 184-186. Prior to October 14, 2012, Zambrano was the subject of 23 investigations by IAB. Lumer Decl., Ex. 3 (Zambrano IAB Resume).[4] Of these, four involved allegations that an individual was injured while in NYPD custody[5] and six involved allegations of unnecessary force. Id. Two of the unnecessary force investigations were considered unsubstantiated and the other four are still

---

[2] One other allegation against Zambrano, classified as "Shield-NYPD-Duplicate/Fake," was also substantiated, but the Court has no information about the circumstances of that complaint or what, if any, disciplinary action was taken as a result.

[3] The parties' Rule 56.1 Statements contain inconsistencies and are not fully supported by evidence in the record. The Court has conducted its own review of the record to calculate the number of complaints filed against Officer Zambrano and which of those included allegations of excessive force. Perhaps illustrative of the deficiencies in the NYPD's disciplinary and supervisory procedures, the Court found it difficult to come up with a precise compilation because the records are difficult to follow, contain overlap when complaints are referred for "additional" investigation and are not consistently classified given the allegations described and the incidents themselves. Therefore, the numbers discussed in this section reflect the Court's best assessment of the evidence in the record.

[4] Though there are 24 separate incidents listed in Zambrano's IAB Resume, two entries refer to the same incident, which occurred on September 22, 2012. For some reason not clear from the record, this incident was given two different IA numbers. See Lumer Decl. Ex. 3; Noble Decl., Exs. MM, NN.

[5] The allegations in one of these complaints was classified in Zambrano's IAB Resume as "DRV-Other Department Rules/Procedures" rather than "Prisoner Injured in NYPD Custody," but a review of the investigation report shows that it involved allegations that Zambrano injured a prisoner during transport after he arrest. See Noble Decl. Ex. JJ.

open allegations. Id. For unexplained reasons, all of the injured prisoner investigations, dating back to May 2008, are still carried as "open" matters. Id.

During this same period, the New York Civilian Complaint Review Board ("CCRB") also investigated 12 complaints about Zambrano, 10 of which involved allegations of excessive force. Lumer Decl., Ex. 6 (Zambrano CCRB Resume). Of these 10, 6 were referred to CCRB by IAB. Noble Decl., Exs. DD[6], GG, II, KK, NN, OO. Zambrano was "exonerated" on one of these allegations and one allegation was closed as "unfounded". Lumer Decl., Ex 6. All the other allegations were found to be unsubstantiated or were closed because the complainant or victim was apparently unavailable or considered uncooperative. Id. Since the adequacy of these investigations is at issue, a brief summary of certain investigations is instructive:

**CCRB Case # 2006614478:** On October 30, 2006, CCRB received a complaint alleging, among other things, that Zambrano and another officer assaulted an individual while the three men were in the back seat of a patrol car. Zambrano denied the allegation. The investigator concluded that "[w]ithout any independent witness to this incident, there is no way to confirm or deny the use of physical force against [the individual]... [and] it does not seem plausible that two officers, dressed in uniform, along with [the individual], could be seated in the rear of a patrol car with ample space for such physical force to be used." The allegation was determined to be "unfounded." See Noble Decl., Ex. CC.

**CCRB Case # 200711636:** On August 13, 2007, CCRB received a complaint that, during a stop, after an individual asked Zambrano if he was being detained, Zambrano grabbed the individual's forearm, threatened him with arrest and threw his identification on the ground.

---

[6] Though this CCRB investigation summary indicates that the case was referred by IAB, this incident does not appear in Zambrano's IAB Resume. See Lumer Decl., Ex 3.

Zambrano and his partner denied the allegations. The investigator concluded that "[w]hile the allegations are plausible, in the absence of independent witness testimony or corroborating evidence, the investigation was unable to reach a determinative finding." The allegation was found to be "unsubstantiated." See Noble Decl., Ex. DD.

CCRB Case # 200713792: On September 21, 2007, CCRB received a complaint from an individual alleging that, during a stop, Zambrano grabbed the individual, kneed him two times in the groin, tightly placed handcuffs on the individual, twisted his arms backwards and then punched him. The investigator spoke to the victim on the phone the next day. He tried to schedule two in-person interviews with the victim in early October, but the victim failed to show up to both. On October 18, 2007, the case was closed as "complainant uncooperative." See Noble Decl., Ex. EE.

IAB Case # 09-39229; CCRB Case # 200912653: On August 11, 2009, Zambrano was involved in a physical confrontation with an individual in custody while Zambrano was taking him to the bathroom in a hospital. A captain from Zambrano's precinct reported that the nurses at the hospital said Zambrano acted aggressively towards the individual, but the Hospital Administrator who reviewed video surveillance of the incident said Zambrano acted appropriately. An IAB investigator spoke to the individual, who said Zambrano had punched him several times while he was being transported to the hospital and that later in the hospital, while Zambrano was taking him to the bathroom, he and Zambrano pushed each other after they got into an argument about what had happened during the transport. The individual gave the investigator his contact information, which the investigator included in the investigation report. The following day, the investigator reviewed the video surveillance of the confrontation and saw Zambrano push the individual and rear cuff him after he put up his fists as if to fight Zambrano.

6

The investigators also learned that one of the hospital employees who was present at the scene said that Zambrano threatened to strike the man before handcuffing him. The case was referred to CCRB for further investigation. See Noble Decl., Ex. JJ.

The CCRB Case Report states that the IAB referral did not contain any contact information for the complainant and the investigator was unable to locate him using other methods. The case was closed as "complainant unavailable." See Noble Decl., Ex. KK.

**CCRB Case # 201200595:** On January 12, 2012, CCRB received a complaint that Zambrano pushed an individual after the individual asked why he was being stopped. The investigator interviewed the individual, who picked Zambrano out of a photo array. Zambrano and his partner could not recall having any interaction with the individual and failed to make any notes about it in their memo books. The investigator was unable to find any documentary evidence confirming the stop, and thus concluded that "[l]acking such evidence, it was not possible to determine if the stop occurred and whether force was used" and the allegation of use of force was "unsubstantiated." Curiously, however, the investigator did conclude that Zambrano interacted with the individual on the day of the incident, and both Zambrano and his partner failed to document the encounter in their memo books. Both officers were cited for failing to adhere to Patrol guidelines. See Noble Decl., Ex. LL.

**CCRB Case # 201212526:** On September 24, 2012, IAB received a complaint from an individual alleging that Zambrano punched him in the ribs while in his cell at Brooklyn Central Booking ("BCB") and again later at the hospital. The same day, the individual told medical personnel at the hospital that he had been hit by a police officer and his medical records showed he had a right rib contusion. The case was referred to CCRB for further investigation. On October 10, 2012, a CCRB investigator interviewed the individual, who gave him a statement

consistent with what he had said to medical personnel. The individual again provided a consistent statement about the incident at a 50h hearing in January 2013. Approximately a year after the incident, in September 2013, the CCRB investigator also spoke with a witness who was incarcerated in the cell next to the individual on the day of the incident, an employee of BCB, Zambrano and his partner. The witness recalled officers using force against the individual, but acknowledged being under the influence of narcotics at the time of the incident. Zambrano denied using force against the victim, but he did not recall any details from their interactions, even though his memo book contained an entry that read: "At 9:28 p.m., one man was in the prisoner van at the corner of Franklin Street and Fulton Avenue. At 11:55 p.m., Det. Zambrano was en route to Brooklyn Central Booking. At 12:20 a.m., Det. Zambrano arrived at Brooklyn Central Booking. At 1:10 a.m., Det. Zambrano went to the hospital and called his desk to inform them." Zambrano's partner stated that he was not present during the interaction between Zambrano and the individual at BCB and thus did not know if they had an altercation, but recalled that the individual only started complaining of broken ribs after Zambrano took him to the holding cell. The investigator concluded that "due to conflicting civilian and officer statements, and in the absence of credible civilian witness testimony, the investigation could not determine by a preponderance of the evidence whether Zambrano used force against [the individual]". Yet again the allegation was found to be "unsubstantiated." See Noble Decl., Ex. OO.

*Civil Lawsuits Against Zambrano*

Zambrano has been named in nine lawsuits. See Def. 56.1 ¶¶ 10-62. Five of these lawsuits involved claims of excessive force. Id. ¶¶ 31, 43, 49, 54, 61. Eight were settled with no admission of liability. Id. One was dismissed after the plaintiff withdrew all claims against

8

Zambrano. Id. ¶ 52. Two of these lawsuits involve incidents that occurred after the altercation between Zambrano and Jenkins. Id. ¶¶ 39-62.

*Zambrano's Disciplinary History and Supervision*

Sometime around 2012, with mounting CCRB complaints, the NYPD placed Zambrano on Force Monitoring Level 1, a program that requires officers to attend a one-week course at the police academy after they receive a certain number of complaints in a certain amount of time. See Lumer Decl., Ex. 2 (Deposition of NYPD Det. Orlen Zambrano) ("Zambrano Dep.") at 173, 191-92. None of Zambrano's supervisors ever discussed the CCRB and IAB complaints or lawsuits with him, and the only person to approach him about the topic was the Indemnity Control Officer from his command who told him about the Force Monitoring program. See Id. at 185-86. In fact, prior to October 14, 2012, Zambrano's supervisor, Sergeant Weber, was not informed about any of Zambrano's prior excessive force complaints or lawsuits, except for one case where Weber was also involved. See Lumer Decl., Ex. 7 (Deposition of NYPD Sgt. Michael Weber) ("Weber Dep.") at 139-141. Weber was never advised that Zambrano was placed on Force Monitoring. Id. at 174.

## LEGAL STANDARD

Summary judgment is only appropriate where the submissions of the parties, taken together, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Ramos v. Baldor Specialty Foods, Inc., 687 F.3d 554, 558 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also O'Hara v. Weeks Marine, Inc., 294 F.3d 55, 64 (2d Cir. 2002) (summary judgment warranted where "facts and law will reasonably support only one conclusion" (quoting McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356 (1991)); Anderson v. Liberty Lobby, 477 U.S. 242, 247-48 (1986) ("[M]ere existence of some alleged

9

factual dispute [] will not defeat an otherwise properly supported motion for summary judgment.").

In evaluating a motion for summary judgment, the Court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Walsh v. NYC Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016) (internal quotation omitted). The moving party "bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010) (internal citation omitted). If satisfied, the burden "shifts to the nonmoving party," Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986), who cannot avoid summary judgment by "rely[ing] on conclusory allegations or unsubstantiated speculation." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted). He must instead "offer some hard evidence showing that [his] version of the events is not wholly fanciful." Id. "Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir. 1991).

## DISCUSSION

In general, municipalities cannot be sued under Section 1983 for injuries inflicted upon others by their employees or agents. Monell, 436 U.S. at 694. However, such claims are permitted if a plaintiff can demonstrate that a deprivation of his or her constitutional rights was caused by an official policy or custom of the municipality. Id. at 690-91. A plaintiff can establish the existence of such a policy or custom by "showing the municipality, alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference" to the rights of the public because it failed to act when "the need for more or better supervision to protect against

10

constitutional violations was obvious." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995); see also Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) ("Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions ... [and this pattern is] sufficiently persistent or widespread as to acquire the force of law."). The municipality's deliberate indifference can be "inferred if prior complaints of misconduct are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents, or if the [municipality's] response is so patently inadequate to the task as to amount to deliberate indifference." Alwan v. City of New York, 311 F. Supp. 3d 570, 584 (E.D.N.Y. 2018) (quoting Vann, 72 F.3d at 1049; Reynolds, 506 F.3d at 192-93). Additionally, the plaintiff must show that the municipality's failure to investigate or rectify the situation was "the result of a conscious choice rather than mere negligence... or bureaucratic inaction." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 128 (2d Cir. 2004) (citing City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989)).

A plaintiff must also show that the deprivation of his or her constitutional rights was a "reasonably foreseeable consequence of, and substantially caused by, the [municipality's] failure to supervise." H.H. v. City of New York, 2017 WL 3396434, at *9 (E.D.N.Y. Aug. 7, 2017). "To be reasonably foreseeable, the harm to plaintiff must be of the same general nature as that which a reasonably prudent person in the [municipality's] position should have anticipated in light of its level of supervision and knowledge of the officer." Id. (internal quotations omitted).

Jenkins argues that, given the various complaints and lawsuits against Zambrano, the City was on notice that he had a history of using excessive force, but "notwithstanding such notice, the NYPD failed to take any meaningful supervisory action or otherwise reasonably investigate

11

or respond to Zambrano's conduct, covered up other misconduct, and left Zambrano in place to continue his pattern and practice of unconstitutional behavior." Amended Compl. ⁋ 58. The City simply contends that these complaints and lawsuits do not establish that Zambrano had a pattern of violating constitutional rights because none of the complaints or lawsuits resulted in a finding that Zambrano used excessive force. See Def. Mem. at 21-22. Moreover, the City argues that Jenkins fails to identify any particular deficiency in the CCRB and IAB investigations and thus cannot show there was a persistent failure to investigate complaints or a policy of tolerance of police misconduct. Id. at 23.

Jenkins proffers evidence from which a reasonable jury could find that the large number of complaints about Zambrano's use of force alerted the City to the risk that Zambrano would again use excessive force against arrestees, and that the City's failure to meaningfully respond to the complaints amounts to a policy of tolerance of excessive force. See Alwan, 311 F. Supp. 3d at 580-81 (finding that an officer's history of complaints, which includes eight CCRB complaints, two additional IAB complaints and two lawsuits alleging the use of excessive force, "would suffice to create a triable issue as to whether it was obvious to the City that there was a risk that [the officer] would use excessive force"); Coggins v. Cty. of Nassau, 254 F. Supp. 3d 500, 520–21 (E.D.N.Y. 2017) ("Courts in the Second Circuit routinely hold that multiple civilian complaints against an officer regarding conduct similar to that exhibited toward a plaintiff is enough for a jury to find the requisite degree of indifference to support failure to supervise liability under Monell.").

The City argues that the Supreme Court's decision in Connick v. Thompson, 563 U.S. 51, 62 (2011), stands for the sensible proposition that city officers cannot be faulted for failure to correct a situation they have no notice of, and thus, Jenkins cannot establish that the City was on

notice that Zambrano had a pattern of actual constitutional violations since none of the complaints or lawsuits against Zambrano resulted in a substantiated finding that he used excessive force. See Def. Mem. at 21-22. However, since Connick, the Second Circuit has explained that a plaintiff can establish deliberate indifference by showing that "a policymaking official was aware of constitutional injury, or *the risk of constitutional injury*, but failed to take appropriate action to prevent or sanction violations of constitutional rights." Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012) (emphasis added); see also Jackler v. Byrne, 658 F.3d 225, 236 (2d Cir. 2011) ("Deliberate indifference to claims of such civil rights violations— tantamount to a custom or policy sufficient to support municipal liability under § 1983—may be inferred from a municipality's lack of appropriate response to repeated *complaints* of such violations." (emphasis added)). In fact, in Jones, the Second Circuit explained that one of the ways a plaintiff can satisfy its burden on a Monell claim is through "a showing of deliberate indifference on the part of supervisory personnel to [constitutional violations], which was communicated to line officers so as to give them the sense that they could engage in such abuse of rights without risking appropriate disciplinary consequences." Jones, 691 F.3d at 82.

While it is true that none of the allegations against Zambrano's use of force were considered substantiated, it is hard to appreciate how the City considers itself blameless given the impressive history of complaints against Zambrano and the "uninterested and superficial" investigations that followed. Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir.1986); see also Vann, 72 F.3d at 1050 (finding that a reasonable juror could conclude that the City's handling of complaints "besp[oke] indifference" even though they were unsubstantiated because there was evidence that they could be true); H.H., 2017 WL 3396434, at *8 (finding that unsubstantiated allegations could still demonstrate deliberate indifference where there was

13

evidence that the investigator was not provided with the adequate resources, and leads and recommendations for additional investigation were ignored); <u>Sango v. City of New York</u>, 1989 WL 86995, at *2-3, *14 (E.D.N.Y. July 25, 1989) (holding that one partially substantiated and three unsubstantiated complaints were sufficient to defeat summary judgment where the plaintiff presented evidence that the investigations were inadequate and predictable).

The investigations in these cases, fairly characterized, were at best modest and no genuine fact-finding occurred. Of the 30 complaints filed against Zambrano, many alleging conduct strikingly similar to the claims alleged yet again in this litigation, it appears from the record that not a single complainant was ever credited. The record further reveals that investigators routinely forgo any classic fact finding, even when there is clear corroborating evidence, preferring instead to affix the unsubstantiated label once the accused officer denies the conduct in question. The clear, unmistakable impression is that if there is no irrefutable corroborating evidence, the matter is conveniently labeled "unsubstantiated," which, as a practical matter, the City equates with exonerated. Apparently, unless an officer is caught red-handed or his conduct is undeniable for whatever reason, the NYPD and the City simply choose to regard the allegation as a non-event having no factual or legal evidentiary significance in terms of supervisory responsibility or legal analysis, no matter the frequency or similarities in the complaints.

A review of the CCRB Closing Reports in the record show:

- <u>(1) Investigators systematically refuse to credit testimony by civilian witnesses with regards to use of force yet routinely credit uncorroborated statements by the officers. Investigators decline to substantiate allegations, even when they find them to be plausible, whenever the officers deny the offending conduct.</u>

14

In one Report, even though the investigator found the complainant credible and the complainant picked Zambrano out of a photo array, the excessive force allegations were considered unsubstantiated because neither Zambrano nor his partner recalled whether they interacted with the complainant and failed to note the encounter in their memo books or file any reports recording the incident. See Noble Decl., Ex. LL. Curiously, the investigator wrote that without any documentary evidence, "it was not possible to determine if the stop occurred and whether force was used." Id. at 7. In contrast, in the same Report, the investigator wrote that "[t]he investigation established that PO Zambrano interacted with [complainant] on the day of the incident" and recommended that Zambrano and his partner be cited for failing to document the encounter in their memo books, a violation of Patrol guidelines. Id. There is no explanation as to why or how the investigator found that there was enough evidence establishing that the encounter occurred in the context of the memo book citation but no evidence to determine if the encounter occurred in the context of the excessive force allegations.

In another Report, the investigator declined to substantiate allegations that Zambrano punched a defendant in the ribs while the defendant was in a holding cell and later at the hospital. The Report shows that the investigator found that the victim provided multiple, consistent statements about the incidents, which were corroborated by his medical records and by a witness present during one of the incidents, and that Zambrano's partner admitted he was not present at the holding cells but the individual started complaining about his ribs only after Zambrano took him there. See Noble Decl., Ex. OO. Nonetheless, since Zambrano denied using force, even though he

15

could not recall anything else about the incident, and since the corroborating witness

admitted being under the influence of narcotics at the time of the incident, the

investigator concluded that he could not determine "by a preponderance of the

evidence whether Zambrano used force against [the victim]." Id. at 2.

- (2) <u>In one-on-one confrontations between an officer and an individual, the standoff is
  always resolved in favor of the officer.</u>

  In one Report, the investigator did not substantiate a complaint that Zambrano and

  another officer punched and hit a defendant while transporting him after an arrest

  because the officers denied doing it and "there were no independent witnesses to this

  incident"—even though it is unclear how there would have been independent

  witnesses in the transporting police vehicle. <u>See</u> Noble Decl., Ex. CC.

- (3) <u>Investigators reach conclusions that defy common sense and do not logically flow
  from the investigation's factual record.</u>

  In the same Report, the investigator concluded the allegations were "unfounded"

  because it did not seem plausible that two officers and an individual could be seated

  in the back of a patrol car "with ample space for such physical force to be used." <u>See</u>

  <u>Id</u>.

- (4) <u>The depth of investigation conducted does not match the gravity of the
  allegations.</u>

  In another Report, the investigator closed the complaint as "complainant

  uncooperative" less than one month after it was received by CCRB because the

  complainant failed to show up to two in-person interviews, despite the fact that the

16

investigator debriefed the witness on the phone the day after the complaint was

received. See Noble Decl., Ex. EE.

- (5) <u>Investigators do not consider the officer's complaint history to identify patterns in the officer's behavior.</u>

  Almost every CCRB Investigation Report contains a section listing the number of

  prior CCRB complaints involving the officers and civilians that are involved in the

  current investigation. However, this section only lists the number of prior

  *substantiated* complaints filed against an officer, indicating that CCRB investigators

  do not take into consideration conduct alleged in prior unsubstantiated complaints and

  thus do not evaluate if there are any concerning patterns in the allegations made

  against an officer. The possible dangers of such a practice are apparent in this very

  case: even though at least three different individuals previously complained that

  Zambrano assaulted them in circumstances very similar to Jenkins's allegations, no

  one identified a potentially concerning pattern in Zambrano's behavior since none of

  the complaints was substantiated. See Noble Decl., Exs. CC, DD, II, LL, OO, PP.

  On the other hand, the number of complaints previously filed by a complainant—

  which would arguably only be relevant to the complainant's credibility—is always

  included without any mention of how they were resolved, painting an asymmetrical

  and skewed picture of the officer and the complainant's history with CCRB. Id.

Even though IAB is responsible for investigating allegations of misconduct and

corruption by police officers, a review of Zambrano's IAB Resume and the IAB investigation

reports in the record demonstrates many concerning inadequacies in how investigations of

excessive force are handled:

- (1) <u>No real, thorough investigation is conducted given that investigators rely on what the subject officer's supervisor relays about the incident.</u>

  In most cases, the investigator receives a report about the incident and the victim's injury from the officer's supervisor. The investigator often does not speak to the officer or even to the victim, and does not follow up with medical personnel to confirm the diagnosis. It is not clear from the investigation reports whether the investigator even confirms whether the supervisor was present at the scene or learned about the facts of the incident from the officer himself. <u>See</u> Lumer Decl., Exs. FF, HH. In fact, Deputy Investigator Frias testified that during his investigation into Jenkins's incident, he did not independently confirm the accuracy of the Jenkins's medical diagnosis because Weber was "a sergeant in the NYPD and [he] expect[ed] him to be truthful and honest." Frias Dep. at 86-89, 91.

- (2) <u>Most complaints are referred to another department for further investigation, but IAB receives no information about how, or whether, those departments conduct investigations and the results of the investigations.</u>

  Almost all complaints made against Zambrano, including ones of excessive force, were referred to CCRB or the Chief of Department Investigative Review Section after they were initially reported to IAB by one of his supervisors. <u>See</u> Lumer Decl., Ex. 3. Frias testified that once complaints are referred to the Chief of Department, they are usually then referred back to the command of the officer involved in the allegation. Frias Dep. at 74. Frias also testified that once an IAB case is referred to another department, that is the end of IAB's involvement in a matter and IAB does not obtain any information about the investigative steps taken by the other department or how

the case was resolved. Id. at 95-96, 147-48, 151. The IAB does not reach its own

conclusion about the veracity of allegations it refers to other departments, and in fact,

almost all the allegations made against Zambrano are still listed as open on his IAB

Resume because the IAB does not know the resolution. See Lumer Decl., Ex. 3; Frias

Dep. at 145. Even if the IAB conducts some investigation into an allegation, if it is

ultimately referred to another department, the IAB does not find out the resolution

and the allegation remains "open" in IAB records. See e.g., Noble Decl., Ex. JJ;

Lumer Decl., Ex. 3.

- (4) <u>Pertinent information from an investigation is not shared with other departments</u>
  <u>conducting additional investigation.</u>

  In one case, the IAB investigated allegations that Zambrano hit a defendant while

  escorting him at the hospital and then referred the complaint to CCRB. However, the

  CCRB investigator was ultimately unable to come to a resolution because the IAB

  referral "did not contain any contact information for [the complainant]." Noble Decl.,

  Ex. KK. Yet, the IAB investigation report of the complaint clearly contains the

  complainant's address and phone number. See Noble Decl., Ex. JJ.

Thus, based on the evidence adduced in this case, a reasonable juror could conclude that

the persistent inadequacies in the CCRB and IAB investigations demonstrate that City officials

"simply did not care what a thorough investigation would reveal [and] were indeed indifferent to

whether or not excessive force was used." Fiacco, 783 F.2d at 331.

Other courts have denied summary judgment or upheld a jury verdict finding the City

liable on a Monell claim based on similar evidence of flagrant investigative deficiencies. In

Fiacco, the Second Circuit upheld a jury's finding of deliberate indifference because there was

19

evidence that the City's response to complaints "generally consisted solely of the chief's speaking to the accused officer—with no formal statement being taken from the complainant, no file being created, no notation being made in the officer's file, and no further investigation being made." 783 F.2d at 331. In <u>Sango</u>, the Court denied summary judgment because it found that the CCRB investigation of prior complaints against an officer was "less than adequate" since the officer was only subjected to brief, mostly leading questions, and was never subjected to rigorous cross examination. 1989 WL 86995, at *3. Additionally, in one investigation, the officer admitted to punching a complainant in the face, though he said he had reasons to do so, and in another, the investigator failed to interview individuals who had witnessed the entire incident. <u>Id.</u> And in <u>H.H.</u>, the Court denied summary judgment because it found that, even though most of the allegations that an officer was involved with known prostitutes were investigated by a sergeant in his command, the investigations were inadequate given that the sergeant did not follow up on many leads, his requests that the investigations be transferred to IAB were denied, and recommendations about additional investigative procedures were ignored. 2017 WL 3396434, at *3-4.

Again, the City relies on <u>Connick</u> to say that Jenkins must not only show deficiencies in the CCRB and IAB investigative procedures, but must also show that the City officials were aware that these deficiencies had resulted in a widespread pattern of excessive force and failed to revise their practices.[7] The Court explained that "without notice that a course of training is

_____

[7] The other cases relied on by the City, <u>Aguirre v. City of N.Y</u> and <u>Triano v. Town of Harrisson, NY,</u> are inapposite here. In both, the Court dismissed the plaintiff's <u>Monell</u> claim at the pleading stage because the plaintiff failed to allege facts substantiating their conclusory assertions about the deficiencies in the City's investigative process. <u>See Aguirre</u>, 2017 WL 4236552, at *7 (E.D.N.Y. Sept. 22, 2017); <u>Triano</u>, 895 F. Supp. 2d 526, 537 (S.D.N.Y. 2012). This is not the case here, where the record reflects factual evidence of the deficiencies in the investigations.

deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." Connick, 563 U.S. at 62. The situation at hand is not analogous. "The City cannot escape liability when put on notice of an officer's possible criminal activities by conducting a poor investigation and then disavowing knowledge as a result of that inadequate investigation." H.H., 2017 WL 3396434, at *10. The City cannot be heard to complain about notice when it allows a demonstrably flawed system to persist while it sticks its head in the sand and pleads innocent ignorance.

The inadequacy of the investigations in this case is particularly relevant given the evidence Jenkins proffered showing that the NYPD routinely treats complaints that have not been substantiated as though the officer has been exonerated from any wrongdoing. Sergeant Weber testified that, in his experience, the NYPD does not inform supervising officers of their subordinate's prior CCRB and IAB complaints or about any lawsuits that are filed against the officers, unless they are substantiated. See Weber Dep. at 142-44, 170. He also does not expect any of his subordinates to inform him when they become the subject of CCRB complaints or IAB investigations, and even if he learns that an officer is the subject of an investigation, he does not question the officer about the facts or circumstances of the case as a matter of course. Id. at 148-49. Significantly, Weber testified that pending complaints, investigations or lawsuits do not affect the way he supervises his officers and unless a complaint against an officer is substantiated, the complaint would be irrelevant to him. Id. at 168, 174-175. Therefore, even though he was never told about any of Zambrano's complaints or lawsuits prior to the incident with Jenkins, those complaints would not have mattered to him because they were "unsubstantiated." Id. at 171.

21

A reasonable jury could find that a monitoring and disciplinary system that disregards any complaint or series of similar complaints because they are unsubstantiated does not demonstrate a "meaningful attempt on the part of [the City] to …forestall further incidents," and it may be reasonably inferred that such a system encourages similar excesses. Vann, 72 F.3d at 1050; see also Reynolds, 506 F.3d at 196 ("If a supervisor's steps are proven so meaningless or blatantly inadequate to the task that he may be said to be deliberately indifferent notwithstanding his nominal supervisory efforts, liability will lie."); Coggins, 254 F. Supp. 3d at 521 (finding that evidence about "the lack of repercussions from the complaints that commanding officers deemed 'undetermined'" showed the police department does not adequately discipline its officers for the conduct at issue in the case). The NYPD's failure to notify supervisors about complaints and Sergeant Weber's refusal to consider unsubstantiated complaints in his day-to-day supervision of officers reflect "a deliberate choice among various alternatives, rather than negligence or bureaucratic inaction." Reynolds, 506 F.3d at 193; cf. Mahan v. City of New York, 2005WL1677524, at *5 (E.D.N.Y. Jul. 19, 2005) (finding that evidence that one complaint went uninvestigated until after the expiration of the statute of limitations period for the offense suggests "at most, one isolated incident of bureaucratic inaction- or perhaps negligent administration… [which] does not rise to the level of an actionable violation").

Jenkins has also proffered evidence supporting an inference that there is a nexus between the CCRB and IAB inadequate investigations, the NYPD's flawed supervisory and disciplinary system and Jenkins's injury. Many of the complaints about Zambrano's use of force involved situations where the complainant was injured by Zambrano while he was in custody—much like the allegation Jenkins makes against Zambrano. See Lumer Decl. Ex. 3; Noble Decl., Exs. CC, JJ, OO. Yet, Zambrano testified that none of his supervisors ever spoke to him about any of the

complaints or lawsuits filed against him or ever expressed concerns about whether the allegations in the complaints or lawsuits filed against him were true. Zambrano Dep. at 190-91, 195-96. The superficial nature of the CCRB and IAB investigations into these complaints and their predictable results may well have indicated to Zambrano, and to any officer, that the City was indifferent to his use of excessive force. See H.H., 2017 WL 3396434, at *11 ("[G]iven his disciplinary history, [the officer] could have believed that the only kinds of violations with which his supervisors were concerned were violations involving the Department or its property."). Indeed, Zambrano admitted that he does not believe the complaints affected his performance evaluations or how he was supervised on a day-to-day basis. Zambrano Dep. at 195-96. His supervisors' disinterest in his complaint history and the lack of serious repercussions could have led Zambrano to believe that his conduct would go unpunished, empowering him to engage in further misconduct, such as that alleged here. A reasonable jury could find that Jenkins's injuries were foreseeable given the City's failure to adequately investigate allegations against Zambrano and to take appropriate measures to supervise and discipline him. See Vann, 72 F.3d at 1050 ("In light of the Department's 'systematic failure' to alert the supervisory units of the filing of new complaints against problem officers, and in the absence of any significant administrative response to [the officer's] resumption of his abusive misconduct upon reinstatement, it was entirely foreseeable that [the officer] would engage in misconduct yet again."); Rasmussen v. City of New York, 766 F. Supp. 2d 399, 410 (E.D.N.Y. 2011) ("[I]f one accepts Plaintiff's assumptions—that repeated instances of constitutional violations by police officers carry no consequences—a factual issue might exist as to whether the lack of consequences contributed to this incident.").

23

## CONCLUSION

The City takes great comfort from the fact that the overwhelming percentage of complaints against Zambrano were found to be unsubstantiated. It suggests that unsubstantiated means exonerated and that the number of complaints, no matter how many, has no probative force and is of no concern. The City maintains this position despite evidence of a demonstrably flawed system that is supported by plainly inadequate investigations that are in most instances effectively stymied by an officer's simple denials. The NYPD knows how to investigate when they choose to. Given the evidence before the Court, a reasonable factfinder could conclude that in Zambrano's case, the City chose not to conduct an investigation or meaningfully monitor his performance but instead chose to disregard a problem officer and invite his continued abuse. Considering the proffered evidence, the Court concludes that the alleged deficiencies in such an apparently flawed system are so obvious that the City's claim of ignorance must be assessed by the fact-finder at a trial on the merits.

SO ORDERED:

s/Raymond J. Dearie

Dated: June 4, 2019
Brooklyn, NY

Raymond J. Dearie
United States District Judge